## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DANETTE RENEE G.,[1]     )
             )
     **Plaintiff,**   )
             )  **CIVIL ACTION**
**v.**           )
             )  **No. 21-2475-JWL**
**KILOLO KIJAKAZI,**    )
**Acting Commissioner of Social Security,** )
             )
     **Defendant.**  )
_____ )

## MEMORANDUM AND ORDER

Plaintiff seeks review of a decision of the Commissioner of Social Security denying Supplemental Security Income (SSI) benefits pursuant to sections 1602 and 1614 of the Social Security Act, 42 U.S.C. §§ 1381a, and 1382c (hereinafter the Act).  Finding no error in the Administrative Law Judge's (ALJ) decision, the court ORDERS that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's final decision.

## I. Background

Plaintiff protectively filed an application for SSI benefits on January 28, 2019.  (R. 16, 550).  After exhausting administrative remedies before the Social Security

---

[1] The court makes all its "Memorandum and Order[s]" available online.  Therefore, in the interest of protecting the privacy interests of Social Security disability claimants, it has determined to caption such opinions using only the initial of the Plaintiff's last name.

Administration (SSA), Plaintiff filed this case seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  Plaintiff claims the ALJ's residual functional capacity (RFC) assessment is not supported by substantial evidence because he did not explain why he did not include certain mental limitations contained in opinions he found persuasive, did not explain why he applied different interaction limitations to different groups of people, and did not account for the moderate limitation he found Plaintiff has in concentration, persistence, or pace.  She also argues he erred at step five by finding Plaintiff capable of an occupation presenting a noise level greater than that of which he found her capable, found her capable of an occupation requiring work under specific instructions without explaining how she could perform that work with only occasional contact with coworkers and supervisors, and by finding Plaintiff capable of occupations requiring Reasoning Level 2 despite limiting her to simple, repetitive, routine tasks and to making simple work-related decisions.

The court's review is guided by the Act.  Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009).  Section 405(g) of the Act provides that in judicial review "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  The court must determine whether the ALJ's factual findings are supported by substantial evidence in the record and whether he applied the correct legal standard.  Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); accord, White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001).  "Substantial evidence" refers to the weight, not the amount, of the evidence.  It requires more than a scintilla, but less

than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971); see also, Wall, 561 F.3d at 1052; Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988). Consequently, to overturn an agency's finding of fact the court "must find that the evidence not only supports [a contrary] conclusion, but compels it." I.N.S. v. Elias-Zacarias, 502 U.S. 478, 481, n.1 (1992) (emphases in original).

The court may "neither reweigh the evidence nor substitute [its] judgment for that of the agency." Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord, Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005); see also, Bowling v. Shalala, 36 F.3d 431, 434 (5th Cir. 1994) (The court "may not reweigh the evidence in the record, nor try the issues de novo, nor substitute [the Court's] judgment for the [Commissioner's], even if the evidence preponderates against the [Commissioner's] decision.") (quoting Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988) (brackets in Bowling)). Nonetheless, the determination whether substantial evidence supports the Commissioner's decision is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion. Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

The Commissioner uses the familiar five-step sequential process to evaluate a claim of disability. 20 C.F.R. § 416.920; Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)). "If a

determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset, whether she has a severe impairment(s), and whether the severity of her impairment(s) meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1).  Williams, 844 F.2d at 750-51.  After evaluating step three, the Commissioner assesses claimant's RFC.  20 C.F.R. § 416.920(e).  This assessment is used at both step four and step five of the sequential evaluation process.  Id.

The Commissioner next evaluates steps four and five of the process—determining at step four whether, considering the RFC assessed, claimant can perform her past relevant work; and at step five whether, when also considering the vocational factors of age, education, and work experience, she is able to perform other work in the economy. Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In steps one through four the burden is on Plaintiff to prove a disability that prevents performance of past relevant work.  Blea v. Barnhart, 466 F.3d 903, 907 (10th Cir. 2006); accord, Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2.  At step five, the burden shifts to the Commissioner to show that there are jobs in the economy which are within the RFC previously assessed.  Id.; Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999).  The court addresses the errors alleged in the order presented in Plaintiff's Social Security Brief.

4

**II.     Assessment of Mental RFC**

Plaintiff makes three arguments of error in the ALJ's assessment of her mental

RFC.  In her first argument of error, she asserts he did not explain why he did not include

certain mental limitations contained in the medical opinions of the state agency

psychological consultants, Dr. Stalker and Dr. Sen, although he found their opinions[2]

persuasive.  She points out both Dr. Stalker and Dr. Sen opined she can carry out 2-step

commands with adequate persistence or pace but would struggle with detailed or complex

instructions and that she is moderately limited in the ability to carry out detailed

instructions.  (Pl. Br. 25) (citing R. 418-19, 438).  Plaintiff argues it was error for the ALJ

not to explain why he did not include an RFC limitation to 2-step commands or from

carrying out detailed instructions.  Id. at 25.  She points out Soc. Sec. Ruling (SSR) 96-8p

requires an ALJ to explain how material inconsistencies or ambiguities in the evidence

were considered and resolved and to explain why he did not adopt a medical opinion

which conflicts with the RFC assessed.  Id. 26.

Next, Plaintiff argues:

> Dr. Stalker opined Plaintiff was moderately limited in the ability to interact
> appropriately with the general public and get along with co-workers or

---

[2] The court acknowledges the findings of the state agency psychological consultants are
properly called "prior administrative medical findings," a term of art referring to the
findings of state or federal agency physicians or psychologists about a medical issue at an
earlier level of review.  20 C.F.R. § 416.913(a)(5).  Although the term is broader in scope
than a "medical opinion," id. at § 416.913(a)(2), both types of opinion evidence are
evaluated for persuasiveness in accordance with the same standard, id. at § 416.920c, and
the terms are often used interchangeably.  The court will follow that practice in this case.

peers without being distracted by them or exhibiting behavioral extremes. Dr. Sen opined Plaintiff was moderately limited in the ability to get along with co-workers or peers without being distracted by them or exhibiting behavioral extremes; interact with the general public; work in coordination or proximity to others without being distracted by them or exhibiting behavioral extremes; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting.  Dr. Sen and Dr. Stalker opined the same level of limitation with respect to the general public, supervisors, and co-workers.  The ALJ precluded all interaction with the general public but permitted occasional (up to 1/3 of an 8 hour workday) interaction with supervisors and co-workers.   The ALJ did not explain why he did not equally limit Plaintiff's ability to interact with the public, supervisors, and co-workers as opined by Dr. Sen and Dr. Stalker.  The ALJ failed to comply with SSR 96-8p and resolve these inconsistencies.

(Pl. Br. 26-27) (citations omitted, citing R. 419, 438-39).  Plaintiff also argues the ALJ erroneously failed to account for Dr. Sen's opinion regarding a moderate limitation in the ability to respond appropriately to changes in the work setting.  Id. at 27.

In her third argument of error in assessing mental RFC, Plaintiff argues the ALJ found her moderately limited in concentration, persistence, or pace in his step-2 and 3 evaluation but failed to include any limitations on her ability to maintain concentration, persistence, or pace.  (Pl. Br. 27-28) (citing Jaramillo v. Colvin, 576 F. App'x 870, 874-75 (10th Cir. 2014); Miranda v. Barnhart, 205 F. App'x 638, 643 (10th Cir. 2005); Wiederholt v. Barnhart, 121 F. App'x 833, 839 (10th Cir. 2005); Brown v. Colvin, No. 12-1456-SAC, 2014 WL 1095048, at *4 (D. Kan. Mar. 19, 2014).

The Commissioner argues the ALJ's Mental RFC assessment is supported by substantial evidence.  She argues an ALJ does not have to address each individual limitation that is not included in the RFC.  (Comm'r Br. 6).  She argues the ALJ did not

need to address detailed instructions because his limitation to simple, repetitive, routine tasks and simple work-related decisions is "work that does not encompass detailed or complex instructions."  Id. at 7-8.  She argues the ALJ limited Plaintiff to unskilled work which the Program Operations Manual System (POMS) explains requires only responding to changes in a routine work setting and Dr. Sen explained Plaintiff was capable of work activity within the limitations set forth in his medical opinion.  Id. 8.

The Commissioner argues the ALJ adequately accounted for the consultative psychologists' opinions of a moderate limitation in getting along with coworkers and the public by limiting Plaintiff to occasional interaction with coworkers and no interaction with the public and accommodated Dr. Sen's moderate limitation in working with supervisors by limiting Plaintiff to occasional interaction with supervisors.  (Comm'r Br. 8-9) (citing Carver v. Colvin, 600 F. App'x 616, 620 (10th Cir. 2015) ("Interacting with supervisors in the course of routine supervision over simple work is tantamount to the 'superficial' interaction typically encountered in jobs involving such work.  To conclude otherwise would parse the ALJ's language too finely."); 20 C.F.R., Pt. 404, Subpt. P, App. 2 §§ 201.00(h)(4)(i), 202.00(g); and SSR 85-15, 1985 WL 56857, at *4 (indicating unskilled work typically involves working with things rather than people (or data))).  She argues the ALJ was entitled to reduce public interaction (to never) from interaction with coworkers and supervisors (occasional) without extensive analysis.  Id. at 9. (citing Chapo v. Astrue, 682 F.3d 1285, 1288 (10th Cir. 2012) ("if a medical opinion adverse to

the claimant has properly been [found persuasive],[3] the ALJ does not commit reversible error by electing to temper its extremes for the claimant's benefit")).

The Commissioner argues that the ALJ's step three finding of a moderate limitation in concentration, persistence or pace was not an RFC assessment but "instead required the ALJ to translate it into concrete work-related limitation(s)," which he did. (Comm'r Br. 9-10) (citing Smith v. Colvin, 821 F.3d 1264, 1269 (10th Cir. 2016); and Vigil v. Colvin, 805 F.3d 1199, 1204 (10th Cir. 2015) for the proposition that an ALJ may account for moderate mental limitations by limiting the claimant to unskilled work activity).

A.     Standard for Evaluating Mental RFC

The Commissioner has promulgated a Psychiatric Review Technique for evaluating mental impairments.  20 C.F.R. § 416.920a (2018) (effective Mar 27, 2017). In evaluating the severity of mental impairments at steps two and three, the technique provides for rating the degree of functional limitation in each of four broad mental functional areas:  understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.  Id. § 416.920a(c)(3).

---

[3] As the Commissioner acknowledges, Chapo was decided under prior regulations requiring all medical opinions to be weighed relative to a particular standard (the treating physician rule).  The court finds the principle for which Chapo is cited applies under the current regulations and it has supplied the bracketed language pursuant to the current regulations.

After rating the degree of limitation in each functional area, the Commissioner determines the severity of Plaintiff's mental impairments.  Id. § 416.920a(d).

When all the functional areas are rated as "none" or "mild," the agency will generally conclude at step two of the sequential evaluation process that Plaintiff's mental impairments are not severe "unless the evidence otherwise indicates that there is more than a minimal limitation in [Plaintiff's] ability to do basic work activities."  Id. § 416.920a(d)(1).  If the mental impairments are severe, the technique requires an evaluation of whether the impairment meets or equals a listed mental disorder by comparing the step two findings and the medical evidence with the criteria of the listings.  Id. § 416.920a(d)(2).  The four broad mental functional areas are also defined as the Paragraph B criteria of most of the Listings of mental disorders.  20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.00E; see also, 12.00A (all mental disorder Listings except 12.05 contain Paragraph B criteria).  If the Commissioner determines that Plaintiff's mental impairments do not meet or equal a listing, he will then assess Plaintiff's RFC.  Id. § 416.920a(d)(3).

In determining RFC, the regulations provide that the Commissioner will consider Plaintiff's "ability to meet the physical, mental, sensory, and other requirements of work."  Id. § 416.945(a)(4).  The regulations provide that "[a] limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work

pressures in a work setting, may reduce [Plaintiff's] ability to do [work.]"  Id.

§ 416.945(c).

The Commissioner has clarified the difference between evaluating the severity of

limitations and restrictions resulting from mental impairments at steps two and three

based upon the broad mental functional areas identified in the psychiatric review

technique and assessing mental RFC.  SSR 96-8p, 1996 WL 374184 (SSA, July 2, 1996).

"The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process

requires a more detailed assessment by itemizing various functions contained in the broad

categories found in" the four broad mental functional areas.  Id. at *4.  RFC must be

expressed in terms of specific work-related functions.  Id. at *3.  "Work-related mental

activities generally required by competitive, remunerative work include the abilities to:

understand, carry out, and remember instructions; use judgment in making work-related

decisions; respond appropriately to supervision, co-workers and work situations; and deal

with changes in a routine work setting."  Id. at *6.  Therefore, an ALJ should not state a

mental RFC in terms of the four mental functional areas but should make a function-by-

function assessment of each of the work-related mental activities relevant to the case at

hand.  Id. at *3-4.

## B.    The ALJ's Relevant Findings

The ALJ found Plaintiff has the severe mental impairments of depression, anxiety

disorder, bipolar disorder, polysubstance abuse disorder, and posttraumatic stress disorder

(PTSD).  (R. 19) (finding no. 2).  He noted that Plaintiff alleged the impairment of

10

borderline personality disorder but found it is a "non-medically determinable

impairments because an 'acceptable medical source' has not established th[is]

impairment during the relevant period using signs, symptoms, and laboratory findings."

Id.  He found at step three that Plaintiff's mental impairments do not equal the severity of

Listings 12.04, 12.06, or 12.15 because none of her mental impairments met the

paragraph B criteria of the mental listings.  Id. at 20.  He found that Plaintiff has

moderate limitations in the first three broad mental functional areas, understanding,

remembering, or applying information; interacting with others; and concentrating,

persisting, or maintaining pace.  (R. 21).  He found Plaintiff has a mild limitation in the

broad mental functional area of adapting or managing oneself.  Id. at 22.

He explained his finding in the mental functional area of concentrating, persisting,

or maintaining pace:

> With regard to concentrating, persisting, or maintaining pace, the claimant
> has a moderate limitation.  The claimant reports significant concentration
> problems (see, e.g., B1E/1-4; B2E/1-9; B5E/1-11; Testimony).  The
> claimant also reported in her function report that she does not finish tasks
> that she starts (see B5E/6).  However, the claimant's attention and
> concentration were within normal limits during numerous medical
> examinations (see, e.g., B1F/1; B8F/13; B12F/4; B17F/49, 59; B18F/25).
> The claimant's friend, Oscar Burnett, also noted in his February 26, 2019
> function report that the claimant finishes tasks that she starts (see B3E/6).
> Furthermore, the claimant did not have difficulty concentrating during her
> February 11, 2019 meeting with H. Wilkinson (see B1E/3-4).  In addition,
> the claimant can concentrate and persist sufficiently to be able to engage in
> a wide variety of activities of daily living (see, e.g., B1E/1-4; B2E/1-9;
> B3E/1-10; B5E/1-11; Testimony).  Therefore, the undersigned finds that
> the claimant has a moderate limitation in concentrating, persisting, or
> maintaining pace.

(R. 21).  The ALJ specifically noted that "limitations identified in the 'paragraph B'
criteria are not a residual functional capacity assessment" and that his RFC "assessment
reflects the degree of limitation the undersigned [(ALJ)] has found in the 'paragraph B'
mental function analysis." Id. 22.

The ALJ assessed Plaintiff with a mental RFC "limited to simple, repetitive, and
routine tasks.  She is limited to making simple work-related decisions.  She can
occasionally interact with supervisors and coworkers.  She can never interact with the
public." Id. 23 (finding no. 5, bold omitted).

The ALJ discussed Plaintiff's allegations of symptoms from and her treatment for
her mental impairments:

> The claimant's statements regarding the severity and limiting effects of her
> depression, anxiety disorder, bipolar disorder, posttraumatic stress disorder
> (PTSD), and accompanying symptoms are inconsistent with the weight of
> the record.  The claimant has a history of psychiatric hospitalizations,
> suicidal ideation, auditory hallucinations, and substance abuse (see, e.g.,
> B20E/1; B18F/10, 12, 22, 28; Testimony).  Tara A. Fields, LCSW, also
> noted that the claimant's February 21, 2021 PCL-5 score of 74 out of 80
> indicated "severe impairment in current functioning due to trauma
> exposure" (see B16F/5).  However, the claimant's Patient Health
> Questionnaire (PHQ) scores indicate that the claimant was suffering from
> depression ranging from "no depression" to "severe depression" (see, e.g.,
> B4F/15; B11F/1-2; B17F/11, 16-17, 30-31, 41, 60-61).  The claimant's
> healthcare providers also described the claimant's depression as a
> "[m]oderate episode of recurrent major depressive disorder" on numerous
> occasions (see, e.g., B4F/10; B17F/4, 18, 58-59, 62; B18F/4, 20).
> Furthermore, the claimant reported moderate anxiety and depression during
> her August 22, 2020 examination (see B17F/58).  In addition, the
> claimant's depression, anxiety, and PTSD-related symptoms improve with
> conservative treatments like medication and counseling (see B9F/3, 8;
> B10F/11, 28; B11F/7, 10, 15; B17F/3-4, 12; Testimony).  The claimant
> reported on March 12, 2019 that her "[d]epression and anxiety has been the

best it has been in a long time," and "she likes Tara the counselor here and this has been beneficial" (see B9F/3). Jacquelene Harris, APRN, noted on several occasions that the claimant "is doing well on Wellbutrin" and "doing well with counseling with Tara" (see, e.g., B9F/8; B10F/11, 28). The claimant reported on August 20, 2019 that her depression was "manageable" (see B11F/15). The claimant reported on October 30, 2019 that trazodone and buspar helped her anxiety, depression, and sleep (see B11F/10). The claimant reported on November 20, 2019 that: (1) her anxiety seems better on buspar; (2) have a job [sic] helps her anxiety a lot; (3) she was not experiencing suicidal ideations; and (4) she did not feel depressed (see B11F/7). Melissa Wolfe, APRN, noted on February 5, 2021 that the claimant "has been doing well on her medications and not asking for more than the prescribed amounts" (see B17F/3).

The claimant's statements regarding the severity and limiting effects of her polysubstance dependence disorder and accompanying symptoms are inconsistent with the weight of the record. The claimant reported on January 8, 2021 that she had been drinking 4-8 alcoholic shooters per day for the past 3 weeks (see B18F/9). The claimant also relapsed on heroin in September 2020 (see B17F/2). However, Ahmed M. Maher, MD, described the claimant's alcohol use disorder as "moderate" in nature (see, e.g., B18F/31). The claimant also reported on September 25, 2020 that she had not used heroin or other drugs for nearly nine months before she relapsed in September 2020 (see B17F/2). Furthermore, Ahmed M. Maher, MD, noted on January 9, 2021 that the claimant's polysubstance use disorder currently was in remission for 1.5 years (see B18F/21). In addition, the claimant denied drug and alcohol use at several examinations (see, e.g., B8F/11; B11F/3; B18F/10). Finally, the claimant also exhibited intact cognitive functioning, memory, thought content, insight, and/or judgment at numerous examinations (see, e.g., B1F/1; B8F/10; B12F/4, 10; B17F/3, 18, 59; B18F/21).

(R. 24-25).

The ALJ explained his consideration of the opinions of the state agency

psychological consultants:

State agency psychological consultant Kim Stalker, PsyD, found on May 1, 2019 that the claimant suffered from severe "Depressive, Bipolar and Related Disorders" and severe "Anxiety and Obsessive-Compulsive Disorders" (see B2A/1-17). Dr. Stalker also found that the claimant

suffered from a mild limitation in understanding, remembering, or applying information; moderate limitation in interacting with others; moderate limitation in concentrating, persisting, or maintaining pace; and mild limitation in adapting or managing oneself (see B2A/1-17).  Furthermore, Dr. Stalker found that the claimant: (1) could carry out two-step commands with adequate persistence and pace; (2) would struggle with detailed or complex instructions; and (3) could handle brief and superficial contact with coworkers and the public (see B2A/1-17).  State agency psychological consultant Sandip Sen, MD, made similar findings on August 27, 2019 at the reconsideration level (see B4A/1-19).  Drs. Stalker and Sen are acceptable medical sources and highly qualified.  Their findings are also largely consistent with the weight of the current record.  For example, their finding that the claimant suffered from mild and moderate "paragraph B" limitations is consistent with the claimant's status mental status examination [sic] results, treatment history, and wide variety of activities of daily living (see, e.g., B1E/1-4; B2E/1-9; B3E/1-10; B5E/1-11; B1F/1; B8F/10; B12F/4, 10; B17F/3, 18, 59; B18F/21; Testimony).  Drs. Stalker and Sen did not have the benefit of physically examining the claimant, but they supported their findings with detailed explanations citing to objective evidence.  They also provided detailed function-by-function assessments of the claimant's residual functional capacity.  For these reasons, the undersigned finds Dr. Stalker's and Dr. Sen's findings persuasive.

(R. 25-26).  The ALJ found the opinion of Plaintiff's therapist, Ms. Fields unpersuasive,

id., and Plaintiff does not contest this finding.

### **C.**   **Analysis**

####   1.   2-Step Commands and Carrying out Detailed Instructions

As Plaintiff suggests, both Dr. Stalker in the initial determination and Dr. Sen in

the reconsideration determination opined Plaintiff "retains sufficient mental capacity to

carry out two-step commands with adequate persistence and pace; but she would struggle

with detailed or complex instructions."  (R. 419, 438).  To the extent Plaintiff may also be

arguing that Dr. Sen intended additional limitation when he found Plaintiff moderately

limited in "[t]he ability to understand and remember detailed instructions" (R. 438), the

court finds he did not.  The form used by Dr. Sen to record his mental RFC opinions states:

> The questions below help determine the individual's ability to perform sustained work activities.  However, the actual mental residual functional capacity assessment is recorded in the narrative discussion(s), which describes how the evidence supports each conclusion.  This discussion(s) is documented in the explanatory text boxes following each category of limitation (i.e., understanding and memory, sustained concentration and persistence, social interaction and adaptation).  Any other assessment information deemed appropriate may be recorded in the MRFC - Additional Explanation text box.

(R. 437-38).  The narrative discussion in the explanatory text box below the understanding and memory section of Dr. Sen's report says merely, "see below."  Id. at 438.  The text box below the sustained concentration and persistence section states, "clmt [sic] retains sufficient mental capacity to carry out two-step commands with adequate persistence and pace; but she would struggle with detailed or complex instructions."  Id. The text box below the social interaction section states, "clmt's [sic] ability to deal with co-workers and the public would be reduced, but adequate to handle brief and superficial contact," and the text box below the adaptation section states, "see below."  Id. at 439. Finally, the Additional Explanation text box states, "Clmt [sic] is capable of work activity within limitations noted above[.]  These findings complete the medical portion of the disability determination."  Id. 439.  In context, it becomes clear the moderate limitation Dr. Sen opined regarding Plaintiff's ability to understand and remember detailed instructions is subsumed within his finding "she would struggle with detailed or complex instructions."  Id. 438.  Following the same rationale, the moderate limitation Dr. Sen

opined in the ability to respond to changes in the work setting would also be subsumed within his other opinions, Plaintiff points to no evidence compelling greater limitations, and the court finds no error and will not further address the alleged failure to account for the moderate limitation in the ability to respond to changes in a work setting.

Plaintiff correctly points out that the ALJ found Dr. Stalker's and Dr. Sen's opinions persuasive but she argues that he erred in failing to include a limitation to 2-step commands and a limitation from carrying out detailed instructions when he assessed an RFC finding Plaintiff "limited to simple, repetitive, and routine tasks [and] to making simple work-related decisions."  (R. 23).  Although the ALJ did not use precisely the language used by the psychologist and psychiatrist, he is not required to do so. Wells v. Colvin, 727 F.3d 1061, 1071 (10th Cir. 2013) ("exact correspondence between a medical opinion and the mental RFC is not required").  The real question for the court then, is whether the ALJ's assessment of mental abilities for simple, repetitive, and routine tasks and making simple work-related decisions adequately accounts for the psychologist's and psychiatrist's opinions that Plaintiff "retains sufficient mental capacity to carry out two-step commands with adequate persistence and pace; but she would struggle with detailed or complex instructions."  (R. 419, 438).  The court finds it does.

This court addressed an issue very similar to this over two years ago.  Kathleen B. v. Saul, Civ. A. No. 19-1219-JWL, 2020 WL 3076598 (D. Kan. June 10, 2020).  In Kathleen B., three psychologists and a psychiatrist opined variously that the claimant had the mental abilities "to understand, remember, use judgment, and make decisions for 1/2

16

step instructions and tasks … to do routine repetitive activity," and "can attend,

concentrate, and maintain pace and persistence for 1-2 step tasks;" was "able to

understand and carry out simple instructions, and her attention and concentration fall

within normal limits;" or can "understand and remember simple instructions" but "may

have difficulty following some detailed instructions" and can "maintain attention and

concentration on simple tasks for periods of at least two hours duration," but "may have

difficulty maintaining concentration on some detailed tasks." Id. at *6. The ALJ found

the claimant had the mental RFC to "understand simple instructions, and carry out and

remember simple, routine, and repetitive tasks involving only simple, work-related

decisions." Id., 2020 WL 3076589 at *6. The ALJ accorded significant weight to each

of these medical professionals' opinions pursuant to the treating physician rule in effect

when that case was filed before the Commissioner. Id., at *4.

      In Kathleen B., the plaintiff argued, similarly to Plaintiff here, that

> [t]he ALJ did not explain why he discounted the limitation to one- to two-
> step instructions and tasks, despite affording the opinions significant
> weight. [And,] The ALJ's RFC limiting [Plaintiff] to simple, routine,
> repetitive tasks does not account for the limitation to one- to two-step
> instructions and tasks.

Id. at *2.

      As here, the court in Kathleen B. found the question for the court was whether the

mental RFC assessed by the ALJ adequately accounted for the psychologists' and

psychiatrist's opinions to which the ALJ accorded significant weight. Id. 6. As here, the

court in Kathleen B. noted that an ALJ is not required to use the same language as the

medical professionals and it noted the medical professionals did not use identical language although the ALJ accorded each opinion significant weight.  Id.  The court noted that the explanations used by the medical professionals also suggested they believed the different language used by each was substantially equivalent.  Id.  The court recognized that it is the plaintiff's burden to show error in the ALJ's decision and she had not done so.  Id. ("it is clear [the ALJ] viewed [the medical opinions] as materially identical, and Plaintiff has not shown otherwise.").

The court finds the ALJ in this case viewed the psychological consultants' opined limitations materially identical to the limitations assessed and, as in Kathleen B., Plaintiff has not shown otherwise.  The circumstances present in this case reveal the ALJ found that the mental limitations opined by the psychological consultants and the mental RFC limitations he assessed were essentially the same.  In accordance with the vocational expert's (VE) testimony and using Medical-Vocational Rule 202.14 as a framework, the ALJ found his mental RFC restricted Plaintiff to unskilled work with an SVP of 2.  (R. 27-28, 379-80).   In similar fashion, the medical consultants, Dr. Bland in the initial determination, id. at 421-22, and Dr. Torres in the reconsideration determination—based on the mental limitations opined by Dr. Stalker and Dr. Sen and using Medical-Vocational Rule 202.13 as a framework—restricted Plaintiff to the performance of unskilled, light work.  Id. at 441-42.  The significance of the different Rule used as a framework by the ALJ is that the ALJ found Plaintiff's past relevant work was skilled or semi-skilled whereas at the lower level there was a "Vocational Explanation" that a

finding regarding past relevant work was not made but "all potentially applicable Medical-Vocational Guidelines would direct a finding of 'not disabled' given the individual's age, education, and RFC." Id. 441.  Moreover, although the court will hereinafter address the General Educational Development Reasoning Level of the representative jobs found available by the ALJ, it is notable that all the unskilled representative jobs relied upon in the initial and reconsideration determinations were Reasoning Level three whereas the unskilled representative jobs relied upon by the ALJ were Reasoning Level one or two.  (R. 28, 421, 441).

The court finds Plaintiff has not met her burden to show ambiguity or inconsistency in the ALJ's consideration of Dr. Stalker's or Dr. Sen's medical opinion or that the ALJ rejected a portion of their opinions.  Therefore, she has not shown that a resolution of ambiguity or further explanation was necessary.

### 2.    Social Interaction Limitations

As noted above, the forms completed by the state agency psychological consultants explain that their opinion regarding Plaintiff's mental limitations is in the mental residual functional capacity assessment as recorded in the narrative discussions in the explanatory text boxes on their forms.  Id. at 418, 437.  Thus, both Dr. Stalker and Dr. Sen opined, "clmt's [sic] ability to deal with co-workers and the public would be reduced, but adequate to handle brief and superficial contact."  Id. 419, 439.  Although Dr. Sen found Plaintiff moderately limited in the ability to accept instructions and respond appropriately to criticism from supervisors, he did not include any additional limitations

19

in his narrative RFC opinion, and he explained Plaintiff is capable of work activity within the limitations he assessed.  Id. at 439.  And, based at least in part on the psychiatrist's opinion, the ALJ assessed Plaintiff with the ability occasionally to interact with supervisors and coworkers, but never to interact with the public.  Id. at 23.

Although, contrary to Plaintiff's assertion, Dr. Stalker and Dr. Sen did not state a specific functional limitation on Plaintiff's interaction with supervisors, in these circumstances it was reasonable for the ALJ to limit her to only occasional interaction with supervisors as he did with coworkers, and Plaintiff does not point to record evidence compelling a greater limitation.  To the extent Plaintiff argues it was error to preclude interaction with the general public while not precluding interaction with supervisors or coworkers, the court notes neither Dr. Stalker nor Dr. Sen specifically stated a functional (constant, frequent, occasional, brief and superficial, or none) limitation in interacting with supervisors.  Moreover, Plaintiff does not point to any representative job assessed wherein the interaction with coworkers, although accumulating up to (less than) one-third of the time, would require more than brief and superficial interaction as the psychologists opined.  Finally, as the Commissioner argues, it is not error for the ALJ to preclude interaction with the public even though the psychologists opined she is capable of brief and superficial contact.  Chapo v. Astrue, 682 F.3d at 1288 (an ALJ does not commit reversible error by electing to temper an opinion's extremes for the claimant's benefit).  Plaintiff has shown no error in assessing social interaction limitations.

3.    <u>The Broad Mental Functional Area of Concentrating, Persisting, or Maintaining Pace</u>

As Plaintiff suggests, in assessing both the severity of Plaintiff's mental impairments at step 2 of the sequential evaluation process and whether the severity of those impairments meets or equals the severity of a listed impairment at step 3, the ALJ found Plaintiff has a moderate limitation in the third broad mental functional area of concentrating, persisting, or maintaining pace.  (R. 21).  As quoted above, the ALJ explained his consideration of that broad mental functional area.  <u>Id.</u> (<u>Supra</u> at 11).  The ALJ also specifically noted that "limitations identified in the 'paragraph B' criteria are not a residual functional capacity assessment" and that his RFC "assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis."  <u>Id.</u> 22.  The ALJ's explanation is confirmed by, and demonstrates his decision to follow, SSR 96-8p in his decision.  (SSA, July 2, 1996).  The SSR explains that mental RFC assessment requires a more detailed assessment of the various functions contained in the four broad mental functional areas, 1996 WL 374184, at *4, and must be expressed in terms of specific work-related functions, <u>id.</u> at 3, such as the ability to understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting."  <u>Id.</u> at *6.

As the ALJ explained, he specifically followed these requirements of SSR 96-8p. He stated the mental RFC using the functional limitations he found after evaluating the four broad mental functional areas:  "The claimant is further limited to simple, repetitive,

and routine tasks.  She is limited to making simple work-related decisions.  She can

occasionally interact with supervisors and coworkers.  She can never interact with the

public." (R. 23) (Bold omitted).  Plaintiff points to no record evidence compelling

greater functional limitations caused by the moderate limitation in her ability to

concentrate, persist, or maintain pace and the court finds none.

 The cases cited by Plaintiff in support of her argument do not require a different

result.  As a preliminary matter the court notes that all the cases cited are not precedent

binding on this court and further finds they are not persuasive for the reasons given

below.  All the cases speak of moderate limitations and all remand for further

proceedings, but all the cases were decided under regulations applying the treating

physician rule and all of the cases are to be distinguished from the situation presented

here.  In Jaramillo, the plaintiff alleged three errors including that the ALJ erred by not

incorporating Dr. Mellon's moderate limitation in his RFC assessment.  Jaramillo, 576 F.

App'x at 873-74.  He further argued the ALJ failed to express RFC in work-related

functions or work-related mental activities when he limited the plaintiff to "simple,

routine, repetitive, and unskilled tasks." Id. at 874.  The court held that the ALJ did not

err in using "unskilled tasks" as shorthand for the mental abilities required for

competitive, remunerative, unskilled work.  Id. at 875.  It found, however that the ALJ's

limitation to simple, routine, repetitive, and unskilled tasks did not adequately capture Dr.

Mellon's three moderate limitations in the individual functional abilities of carrying out

instructions, attending and concentrating, and in working without supervision.  Id. at 876.

Jaramillo is to be distinguished in that it applies to functional limitations in particular abilities expressed by a healthcare professional not to step-two or three findings of the ALJ, and it relies on the fact the ALJ provided no explanation why the healthcare professional's moderate functional limitations were not included. Here the ALJ expressed the limitation himself in his step-three discussion, explained the limitation, and explained that the RFC assessed includes the functional limitations he found. Moreover, Dr. Mellon's moderate limitations related to individual functional abilities not the broad mental functional areas.

In Miranda, the ALJ accorded little weight to the global assessment of functioning of Dr. Marten, a consultative psychologist who examined the plaintiff and he accorded greater weight to the opinion of Dr. Pedowitz, the state agency physician who reviewed the file and opined regarding the plaintiff's mental abilities. 205 F. App'x at 640. The court "note[d] that in the ALJ's step-three discussion, … he stated that '[m]oderate difficulties in maintaining concentration, persistence, or pace are suggested by the consultative psychological examination [(of Dr. Marten)].'" Id. at 643. The court also noted that Dr. Pedowitz found moderate to marked limitations in the ability to maintain attention and concentration for extended periods and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace. Id. The court stated,

> despite his remarks in the listing discussion, and his accordance of greater
> weight to Dr. Pedowitz's report, the ALJ did not further mention
> concentration, persistence, or pace—characteristics that would appear to be

23

crucial factors in the type of work that the ALJ believed Mr. Miranda was capable of doing (one— or two-step jobs that require minimal supervision or interaction with co-workers).  It does not appear that the ALJ ever made a firm determination regarding restrictions in these areas, and no such restrictions were included in the RFC or in the first hypothetical question to the VE.

Id.  The court concluded, "These omissions should be remedied on remand.  Id.

Miranda is to be distinguished because although the ALJ in this case made a similar statement regarding concentration, persistence, or pace, he explained his consideration, he made a firm determination, and this case contains no other evidence compelling remand for further consideration as did the record in Miranda.

Although the court in Wiederholt remanded because the ALJ did not include in the hypothetical question to the VE the moderate difficulties he found in maintaining concentration, persistence, or pace, there is simply no consideration in that case whether the ALJ pointed out that his statement regarding concentration, persistence, or pace was a part of the RFC consideration or whether he had specifically included the functional limitations he found in the RFC he assessed.  The district court's decision in Brown is to the same effect with no discussion of the presence (or absence) of the ALJ's explanation for his consideration of the moderate limitation or its place within the RFC he assessed.

Plaintiff has shown no error in the ALJ's RFC assessment.

**III.    Step Five of the Sequential Evaluation Process**

Plaintiff presents three arguments of error at step five of the sequential evaluation process.  She argues the ALJ found Plaintiff limited to level three noise but erroneously found her capable of an occupation, hand packager, with level four noise.  (Pl. Br.  30).

24

The Commissioner argues that even if the court assumes it was error to find Plaintiff capable of the hand packager occupation, the other two occupations, maid and price marker, total 963,000 jobs in the economy which renders the error harmless as a matter of law.  (Comm'r Br. 11-12) (citing Raymond v. Astrue, 621 F.3d 1269, 1274 (10th Cir. 2009).

Plaintiff next argues the ALJ found her capable of an occupation, maid, requiring work under specific instructions but did not explain "how an individual working under specific instructions with no room for independent judgment or action in carrying out job functions or working out job problems could perform that work successfully with occasional contact with coworkers and supervisors."  (Pl. Br. 30) (quoting Sartiaguda v. Comm'r of Soc. Sec. 2019 WL 250531, at *4 (E.D. Calif. Jan. 17, 2019).  The Commissioner responds that Plaintiff's Brief "cited no basis or authority for her belief that the Maid occupation has this requirement so as to allow the Commissioner to fully respond" and the court should find this argument waived.  (Comm'r Br. 12, n.8).  She further argues that Plaintiff's argument "says nothing about the frequency or degree of supervisory contact, which is what the ALJ's RFC limitation addressed."  Id.  In an apparent attempt to avoid waiver, Plaintiff reiterates her argument, repeats the quote from Sartiaguda in her Reply Brief and notes the Dictionary of Occupational Titles (DOT) provides "the job of maid (DOT 323.687-014) requires: 'U: Working UNDER specific instructions.'"   (Reply 9-10, and n.7).

Finally, Plaintiff argues the ALJ's limitation to simple, repetitive, routine tasks and to making simple, work-related decisions is consistent with Reasoning Level one but inconsistent with the ALJ's finding that Plaintiff is able to perform the occupations of a maid or a marker both of which require Reasoning Level 2.  (Pl. Br. 30-31).  Plaintiff recognizes a conflict within the District of Kansas, noting that other judges of this district have decided cases suggesting limitations "to 'simple, routine, repetitive tasks involving only simple, work-related decisions with few, if any, workplace changes;'" id. at 31 (quoting R.S. v. Saul, Case No. 20-2416-SAC, 2021 WL 2156412, at *9 (D. Kan. May 27, 2021); "to simple, routine work;" id. (citing McNary v. Saul, No. 2:19-CV-02105-EFM, 2020 WL 5942283 at *2 (D. Kan. 2020); and "to simple work:" id. (citing Johnson v. Berryhill, Case No. 16-4185-SAC, 2017 WL 6508944, at *9 (D. Kan. Dec. 20, 2017); and Pemberton v. Berryhill, Case No. 16-2501-SAC (D. Kan. April 26, 2017; slip op., at 6-7)); are inconsistent with occupations requiring Reasoning Level 2.  (Pl. Br. 31) (also citing Alissia M. v. Saul, Case No. 19-2105-EFM, 2020 WL 1847745, at *10 (D. Kan. Apr. 13, 2020); and C.P. v. Saul, Case No. 19-1256-JWB, 2020 WL 6544582, at *6-7 (D. Kan. Nov. 6, 2020)).

The Commissioner points out this court's repeated findings of no conflict between an "RFC for simple, repetitive, and routine tasks and GED [(General Educational Development)] Reasoning Level two jobs."  (Comm'r Br. 12) (citing Karen Jean M. v. Saul, Civ. A. No. 19-2455-JWL, 2020 WL 5057488, at *14 (D. Kan. Aug. 27, 2020); and Kyle Edward Victor G. v. Saul, Civ. A. No. 19-2518-JWL, 2020 WL 3960422, at *11 (D.

26

Kan. July 13, 2020)).  She argues that "in any event, contrary to Plaintiff's argument (Plaintiff's Brief at p. 30-31), the Maid occupation—which itself totals 896,000 national jobs—has a GED Reasoning Level of only one."  Id. (citing DICOT 323.687-014, 1991 WL 672783).  In her Reply Brief, Plaintiff acknowledges this court's holding in Karen Jean M., distinguishes that case because it did not address 1-2 step instructions and/or commands, and "asks the Court [sic] to re-consider the issue given other persuasive case law on the issue."  (Reply 11).

**A.**     **The ALJ's Findings**

The ALJ explained his step five findings which are reproduced in relevant part here:

> The vocational expert testified that given all of these factors [(age, education, work experience, and RFC)] the individual would be able to perform the requirements of representative LIGHT SVP 2 occupations such as Hand Packager (559.687-074, light exertion level, SVP 2, 468,000 jobs nationally); Maid (323.687-014, light exertion level, SVP 2, 896,000 jobs nationally); and Price Marker (209.587-034, light exertion level, SVP 2, 67,000 jobs nationally).

> Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

> Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule [(202.14)].

(R. 28-29).

**B.**     **Analysis**

27

### 1.    Level Three Noise

Plaintiff points out the hand packager occupation involves loud, level 4 noise and the Commissioner does not argue otherwise. Therefore, the court finds the noise level of that occupation exceeds the level of which the ALJ found Plaintiff is capable (level 3). Consequently, Plaintiff is unable to perform that representative occupation. The Commissioner argues the error is harmless because the number of jobs in the remaining representative occupations, 963,000, is a significant number as a matter of law.

The court agrees. The Tenth Circuit has found harmless error in cases such as this and has found a significant number of jobs represented by the remaining occupations when the number of jobs remaining ranged from at least 152,000 jobs to over 1,300,000 jobs. Bainbridge v. Colvin, 618 F. App'x. 384, 391–92 (10th Cir. 2015) (500,000 jobs); Shockley v. Colvin, 564 F. App'x. 935, 940–41 (10th Cir. 2014) (215,000 jobs); Chrismon v. Colvin, 531 F.App'x. 893, 899–900 (10th Cir.2013) (212,000 jobs); Raymond v. Astrue, 621 F.3d 1269, 1274 (10th Cir.2009) (1,340,000); Stokes v. Astrue, 274 F. App'x. 675, 684 (10th Cir.2008) (152,000 jobs).

### 2.    Work Under Specific Instructions

Plaintiff is correct that the DOT provides the occupation of maid requires "Working UNDER specific instructions." DICOT 323.687-014, 1991 WL 672783 (DOL January 1, 2016). Plaintiff implies in her brief that the ALJ should have explained "how an individual working under specific instructions with no room for independent judgment or action in carrying out job functions or working out job problems could perform that

work successfully with occasional contact with coworkers and supervisors." (Pl. Br. 30) (quoting <u>Sartiaguda</u>, 2019 WL 250531, at *4). Plaintiff's argument is without merit. First, Plaintiff cites to an unpublished decision from the Eastern District of California, a decision with no binding authority over this court. Second, she provides no argument as to the persuasive value of that decision in this case. Third, she provides no basis for the suggestion that Plaintiff would have "no room for independent judgment or action in carrying out job functions or working out job problems" based on the record or RFC in this case. Fourth, she does not recognize the circumstances of the case she quotes as her authority. The portion of the opinion quoted from <u>Sartiaguda</u> is not the court's holding in that case but is a quote of the court's synopsis of <u>the plaintiff's</u> argument. 2019 WL 250532, at *4-5. Moreover, the court in <u>Sartiaguda</u> found that plaintiff's argument unpersuasive. <u>Id.</u> at 5-6. This court sees no reason to find otherwise.

        3.    <u>Whether GED Reasoning Level Two Is Inconsistent with RFC Limitations to Simple, Repetitive, Routine Tasks and to Making Simple, Work-related Decisions</u>

As Plaintiff recognizes, courts in this district are split on whether such RFC limitations are consistent with GED Reasoning Level two. As the Commissioner points out, this court has repeatedly found that they are consistent. In her Reply Brief, Plaintiff quotes the rationale from <u>C.P. v. Saul</u>, 2020 WL 6544582, at *6-7 and asks the court to reconsider this issue. (Reply 10). The court has done so and finds no justification to change its position.

As this court explained in <u>Karen Jean M.</u>, the ability to perform unskilled work is dependent more upon the SVP level of the work as recorded in the DOT than it is upon the Reasoning Level.  The regulations define "unskilled work:"

> Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.  The job may or may not require considerable strength.  For example, we consider jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and <u>a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed</u>.  A person does not gain work skills by doing unskilled jobs.

20 C.F.R. § 416.968 (emphasis added). The court also notes that VEs are experts in the evaluation of vocational terms not laymen, attorneys, ALJs, or even courts.

The DOT defines SVP:

> Specific Vocational Preparation is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.

> This training may be acquired in a school, work, military, institutional, or vocational environment.  It does not include the orientation time required of a fully qualified worker to become accustomed to the special conditions of any new job.  Specific vocational training includes: vocational education, apprenticeship training, in-plant training, on-the-job training, and essential experience in other jobs.

DOT, App'x C, II, available online at:  https://www.dol.gov/agencies/oalj/PUBLIC/ DOT/REFERENCES/DOTAPPC (last visited November 23, 2022).  There are nine SVP levels which are mutually exclusive, do not overlap, and range from level 1, "Short demonstration only" to level 9, "Over 10 years."  <u>Id.</u>  The time required for SVP 1 is

"Short demonstration only" and for SVP 2 is "Anything beyond short demonstration up to and including 1 month."  Id.

Reasoning Level, on the other hand is defined in the DOT as one of three divisions in the GED Scale.  Id. at III. GED is also defined in the DOT:

> General Educational Development embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance.  This is education of a general nature which does not have a recognized, fairly specific occupational objective.  Ordinarily, such education is obtained in elementary school, high school, or college. However, it may be obtained from experience and self-study.
>
> The GED Scale is composed of three divisions:  Reasoning Development, Mathematical Development, and Language Development.

Id.  App'x C, III.  The GED reflects 6 levels each, of Reasoning Development, Mathematical Development, and Language Development.  Id.  As relevant to the court's discussion here, the DOT defines Reasoning Development Levels 1, 2, and 3:

> 01 LEVEL REASONING DEVELOPMENT
>
> Apply commonsense understanding to carry out simple one- or two-step instructions.  Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

Id. App'x C, III, available at:

https://www.dol.gov/agencies/oalj/PUBLIC/DOT/REFERENCES/DOTAPPC (last visited November 23, 2022).

> 02 LEVEL REASONING DEVELOPMENT
>
> Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions.  Deal with problems involving a few concrete variables in or from standardized situations.

31

Id.

03 LEVEL REASONING DEVELOPMENT

Apply commonsense understanding to carry out instructions furnished in
written, oral, or diagrammatic form.  Deal with problems involving several
concrete variables in or from standardized situations.

Id.  The Tenth Circuit has held that a mental RFC limited to "the attention, concentration,

persistence and pace levels required for simple and routine work tasks" is inconsistent

with the demands of level-three reasoning.  Hackett, 395 F.3d at 1176 (quoting the RFC

assessed for Ms. Hackett, and citing Lucy v. Chater 113 F.3d 905, 909 (8th Cir. 1997)).

The court went on to note that "level-two reasoning appears more consistent with [Ms.

Hackett's] RFC."  Id.

GED, and thus Reasoning Level, relates to the amount of education (formal or

informal) an occupation requires.  "Reasoning development" is one of three divisions of

educational development, and Reasoning Level one and Reasoning Level two relate to

occupations which require the lowest two levels of educational development in reasoning.

While it might be reasonable for a layman, an attorney, or a court to conclude from the

plain language of the DOT definition of 01 level reasoning development that the

educational development necessary "to carry out simple ... instructions" is equivalent

with the mental abilities "to understand and remember very short and simple instructions"

and to "carry out very short and simple instructions," and to conclude from the plain

language of the DOT definition of 02 level reasoning development that the educational

development necessary "to carry out detailed but uninvolved written or oral instructions"

32

requires the <u>mental abilities</u> "to understand and remember detailed instructions" and "to carry out detailed instructions," Plaintiff cites no authority requiring it and the court finds none.

Reasoning Level in the DOT relates to the educational background a particular occupation requires whereas mental abilities in a Mental Residual Functional Capacity Assessment represent 20 mental functional abilities grouped in 4 categories—Understanding and Memory, Sustained Concentration and Persistence, Social Interaction, and Adaptation.  Program Operations Manual System (POMS) DI 24510.060(B)(2) available at <u>https://secure.ssa.gov/apps10/poms.nsf/lnx/0424510060</u> (last visited November 23, 2022).  The ability to understand and remember instructions and the ability to carry out instructions fall within the categories of Understanding and Memory, and of Sustained Concentration and Persistence, respectively.  (R. 418, 438); see also POMS DI 24510.060(B)(2).  While educational requirements and mental abilities intuitively appear to be related, Plaintiff has shown no direct correlation and the regulations as quoted above specifically relate unskilled work to SVP levels 1 or 2 rather than GED reasoning development levels and the VE testified that an individual with the Mental RFC assessed here would be able to perform the representative jobs of Maid and Price Marker relied upon by the ALJ, and that her testimony was consistent with the DOT and SCO. (R. 382).

The court's finding in <u>C.P. v. Saul</u>, to which Plaintiff appeals, reasons:

The plain language of the DOT suggests that a limitation to one-to-two-step instructions conflicts with the requirements for jobs requiring level two reasoning.  Cases such as <u>Karen Jean M.</u> concede as much.  <u>Karen Jean M.</u>,

2020 WL 5057488, at *14 (acknowledging "it might be reasonable for a layman, an attorney, or a court to conclude from the plain language of the DOT definition" that a conflict exists). The ALJ was not entitled to rely on the vocational expert testimony that Plaintiff can perform such jobs without addressing this apparent conflict. Haddock v. Apfel, 196 F.3d 1084, 1091 (10th Cir. 1999) ("the ALJ must investigate and elicit a reasonable explanation for any conflict between the Dictionary and expert testimony before the ALJ may rely on the expert's testimony as substantial evidence to support a determination of nondisability.") In Hackett, the Tenth Circuit found that such an apparent conflict with a DOT Reasoning Level requires a remand. Hackett, 395 F.3d at 1176. Applying Hackett, the court must reach the same conclusion here.

Karen Jean M. distinguished Hackett on the grounds that it involved a level three reasoning job rather than a level two job. Karen Jean M., 2020 WL 5057488, at *13. But that fact was not material to Hackett's unmistakable conclusion that a facial conflict between a DOT Reasoning Level and limitations in an RFC must be addressed by the ALJ. Karen Jean M. also asserted that no conflict exists in such circumstances because DOT Reasoning Levels are merely educational levels, not job skills. Id. at *14. That view – though not unreasonable – is not consistent with the reasoning of Hackett. Had the Tenth Circuit been of that view in Hackett, it would not have found an apparent conflict and remanded the case. Garcia v. Barnhart, 188 F. App'x 760, 767 (10th Cir. 2006) ("in Hackett we found a facial conflict between a claimant's 'inability to perform more than simple and repetitive tasks' and the 'level-three reasoning' required in the DOT for jobs identified by the VE, and, consequently, reversed and remanded for an explanation.") As noted previously, Hackett treated DOT Reasoning Levels as describing requirements for job performance.

2020 WL 6544582, at *6-7.

As quoted above, the court in C.P. made clear its decision (and, in its view, that of the Tenth Circuit in Hackett) is based upon a facial conflict between the "plain language" of the DOT and the language used by the state agency psychologists in the cases at issue. That argument misses the point of the court's review of a Social Security decision for whether the Commissioner's factual findings are supported by substantial evidence in the

34

record and whether she applied the correct legal standard.  The legal standard for this issue is as quoted by the <u>C.P.</u> court above: "the ALJ must investigate and elicit a reasonable explanation for any conflict between the Dictionary and expert testimony before the ALJ may rely on the expert's testimony as substantial evidence to support a determination of nondisability."  <u>Haddock</u>, 196 F.3d at 1091.

In fact, however, there is no conflict here.  A Plaintiff may not produce a conflict by applying a lay understanding to a vocational term for which there is a clearly defined meaning and arguing that term is inconsistent with another term or phrase with which there is really no conflict when the vocational term (Reasoning Level) is properly understood.  It is the court's duty to consider the parties' arguments and do the necessary research to understand the relevant terms in their appropriate (in this case vocational/ DOT) context.

In <u>Hackett</u>, the deciding issue was whether there was a conflict between the VE testimony and the DOT.  395 F.3d at 1174-75.  The ALJ found in his decision "that the VE explained this discrepancy by relying on his own 'education, experience and observations of the jobs as actually performed in the economy.'"  <u>Id.</u> at 1175.  However, both the district court and the Tenth Circuit recognized there was "no indication in the record that the VE expressly acknowledged a conflict with the DOT or that he offered any explanation for the conflict."  <u>Id.</u>  The district court ruled, nevertheless, the ALJ's assertion was unnecessary to the decision "because there was no conflict between the

VE's testimony and the DOT," but the Tenth Circuit disagreed "with respect to the required Reasoning Level." Hackett, 395 F.3d 1175.

The Hackett court noted that the occupations at issue required "a Reasoning Level of three, defined as the ability to '[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form [, and d]eal with problems involving several concrete variables in or from standardized situations.'" Id. at 1176 (quoting the DOT Reasoning Level 3 for the occupations at issue). The court found the plaintiff's Mental RFC, including "'the attention, concentration, persistence and pace levels required for simple and routine work tasks,' … seems inconsistent with the demands of level-three reasoning." Id. (quoting the appellate record) (citing Lucy v. Chater, 113 F.3d 905, 909 (8th Cir.1997) (rejecting contention that a claimant limited to following only simple instructions could engage in the full range of sedentary work because many unskilled jobs in that category require Reasoning Levels of two or higher)). Immediately after citing Lucy's proposition as stated above, the court noted "that level-two reasoning requires the worker to '[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions [and d]eal with problems involving a few concrete variables in or from standardized situations.' This level-two reasoning appears more consistent with Plaintiff's RFC." Id. (quoting DOT definition of level two reasoning). The court determined it "must reverse this portion of the ALJ's decision and remand to allow the ALJ to address the apparent conflict between Plaintiff's inability to perform more than simple and repetitive tasks and the level-three reasoning

required by the jobs identified as appropriate for her by the VE." <u>Hackett</u>, 395 F.3d at 1176.

Although the court in <u>Hackett</u> noted the district court's finding that there was no conflict between the VE testimony and the DOT, it does not address the court's bases nor rationale for that finding. Moreover, the court did not address the definition of unskilled work as defined in 20 C.F.R. §§ 404.1568, 416.968 nor the explanation in Appendix C of DOT for the relationship between SVP, GED, or Reasoning Level as discussed above. Thus, as the court in <u>C.P. v. Saul</u> suggests, it appears the decision in <u>Hackett</u> was based on a facial conflict between the plain language of the DOT without any inquiry into the actual meaning of the terms in the DOT in their vocational context and no consideration of the vocational meaning of the DOT definition of Reasoning Level 3. While it is not clear to this court that Reasoning Level 3 is appropriately applied to unskilled work in every case, the court notes that many VE's provide examples of such work in response to hypothetical questions limiting a claimant to unskilled work, and the state agency consultants at the initial and reconsideration level in this case did the same. In any case, as noted above, in <u>Hackett</u>, apparently using the same plain language and facial conflict considerations it had used in reaching its decision, the court noted level-two reasoning appears more consistent with the RFC in that case which is remarkably similar to the RFC assessed in this case. Reasoning Level 2 was not the specific issue in <u>Hackett</u> but this court does not find justification therein to extend its prohibition to Reasoning Level 2 in the face of DOT Appendix C and the definition of unskilled work, in the face of

Hackett's specific statement regarding Reasoning Level 2, and absent a specific holding by that court binding on this court.

Finally, the court notes that as the Commissioner suggested, the occupation of maid has a GED Reasoning Level of one and represents 896,000 jobs in the economy. Therefore, even if the court found a conflict with Reasoning Level 2, it would find a significant number of jobs available as a matter of law as discussed supra, p.28.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's final decision.

Dated November 30, 2022, at Kansas City, Kansas.

s/ John W. Lungstrum
**John W. Lungstrum**
**United States District Judge**